## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| DANIEL FINERMAN and DONNA DEVINO, individually and on behalf of all others similarly situated, | CASE NO:  3:14-cv-1154-J-32MCR |
| *Plaintiffs,* | |
| v. | CLASS ACTION |
| MARRIOTT OWNERSHIP RESORTS, INC., a  foreign  corporation, and INTERNATIONAL CRUISE & EXCURSION GALLERY, INC., a foreign corporation, | JURY TRIAL DEMANDED |
| *Defendants.* | |

## SECOND AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, Daniel Finerman and Donna Devino, individually and on behalf of all persons similarly situated, by and through their undersigned counsel, bring this Second Amended Class Action Complaint against Defendants, Marriott Ownership Resorts, Inc. and International Cruise & Excursion Gallery, Inc., and allege as follows:

## NATURE OF THE ACTION

1.      Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this consumer class action lawsuit against Defendants, Marriott Ownership Resorts, Inc. and International Cruise & Excursion Gallery, Inc., for their unfair and deceptive conduct in hiding the true cost of cruises offered to consumers in exchange for points allocated to them as a result of their purchase of memberships in a timeshare business concept offered for sale by Marriott Ownership Resorts,

---

[1] This Second Amended Complaint corrects certain minor typographical and stylistic errors made in the proposed pleading submitted at Doc. 72-1.  No substantive changes have been made.

Inc. As set for the below, Marriott Ownership Resorts informs consumers who purchase memberships in its timeshare concept under the Marriott Vacation Club Destinations Program that instead of using points allocated to them each year to stay in the timeshare resort for which they initially purchased their memberships, they may use their points for cruises, hotels, guided tours and other specialty packages. What Class Members are not told is that when using their points to book a cruise, their points will not cover the total costs of the cruise fare and that they will need to pay cash to cover the shortfall. As a part of Defendants' scheme, Defendants hid, and continue to hide, this shortfall as pass through charges; initially the additional out-of-pocket cost were described as "port fees" and, in approximately 2014, the additional cost was described to consumers as "cruise line pass through fees." In describing the additional costs in this manner, Class Members are deceived and misled into believing that these were fees owed to governmental entities and port authorities by class members when booking cruises. In addition, the practice of Defendants' using these descriptive terms in place of describing the extra costs as just that, the additional sums necessary to pay for the cruise fare, is unfair, deceptive and unconscionable.

2. Plaintiffs expressly reserve the right to amend and supplement this Second Amended Complaint as other information relevant to this action becomes available.

## PARTIES, JURISDICTION AND VENUE

3. Plaintiff, Daniel Finerman, is a resident of the state of Florida.

4. Plaintiff, Donna Devino, is a resident of the state of New Jersey.

5. Defendant, Marriott Ownership Resorts, Inc. (hereinafter Marriott Vacation Club or MORI), is a Delaware corporation with its principal place of business and officers located in Orlando, Florida. Marriott Vacation Club operates substantial business in this state, and is

subject to personal jurisdiction in this state. It is a wholly owned subsidiary of Marriott Vacations Worldwide Corporation.

6.      Defendant, International Cruise & Excursion Gallery, Inc. (hereinafter International), is a Delaware corporation with its principal place of business in Scottsdale, Arizona, that conducts substantial business in this state and in this District, and is authorized to do business in this state. International's status with the Florida Department of State, Division of Corporations, is listed as active.  It has registered the fictitious name "Our Vacation Center" with the Florida Department of State.  Its office is listed as 15501 N. Dial Blvd., Scottsdale, Arizona. International also maintains a significant basis of operations at 11059 International Drive, Orlando, Florida. From this location in Orlando, it employs hundreds of individuals selling its cruise programs to consumers, among other activities.

7.      Beginning in 2009, Marriott Vacation Club has had a contract with International whereby International is the exclusive provider of travel agent booking services when its members, such as Plaintiffs herein, seek to use their membership points to book cruises on cruise ships or flights on various airlines.  At all times described herein, International acted as the exclusive agent for Marriott Vacation Club in handling and booking cruises for consumers, such as Plaintiffs, who were members of Marriott Vacation Club. Marriott Vacation Club is responsible and liable for the acts of International.

8.      Specifically, when members of Marriott Vacation Club (Marriott Vacation Club member or Class Members) seek to use their points to book cruises, Class Members, as was the case for Plaintiffs here, are required by Marriott Vacation Club to use International as the booking agent to book the cruises. More particularly, when a Marriott Vacation Club member seeks to book a cruise using their assigned or accumulated points, they contact Marriott Vacation

Club, and after confirming that the member is seeking to book a cruise, the Marriott Vacation Club employee then contacts International and informs the International employee that they have a Marriott Vacation Club member on the line who wants to book a cruise using their membership points to book the cruise.   The International employee then confirms with the Marriott Vacation Club employee how many points that the member has available to book a cruise. Once done, the Marriott Vacation Club employee then connects the Marriott Vacation Club member to the International employee through a transfer referred to as a warm transfer. The Marriott Vacation Club member is not informed that they are now speaking with an employee of International. Without informing the Marriott Vacation Club member that the conversation is being recorded, the conversation is then recorded and the International employee discusses with the Marriott Vacation Club member which cruise that the Marriott Vacation Club member seeks to book using their points. If the Marriott Vacation Club member decides on that call to book the cruise, the International employee informs the Marriott Vacation Club member that the Marriott Vacation Club member will have to pay "port fees" (as a result of the filing the this lawsuit, the term was changed to "cruise line pass through fees") and government fees, along with a processing fee. The International employee then requests the Marriott Vacation Club member's credit or debit card information from the Marriott Vacation Club member to pay for the amount of the government fees and port fees, which the International employee represents to the Marriott Vacation Club member is the amount that the Marriott Vacation Club member owes for the mandatory government fees and port fees as part of the cruise, along with a processing fee.

9.     After booking the cruise, International would then send to the Marriott Vacation Club member a document bearing the multi-colored Marriott Vacation Club logo to confirm the booking and the out-of-pocket sums paid for government fees, port fees, the processing fee, and

if the International employee was able to sell the member travel insurance, the premium for the insurance. Forms of the written confirmations, as used in Plaintiffs' bookings, are set forth below.

10.    At all material times, and in each instance where a Marriott Vacation Club member booked a cruise using their points, International was acting as the actual or apparent agent for Marriott Vacation Club, was acting in the course of the agency relationship created by Marriott Vacation Club, or was vested with the apparent authority in the manner and way in which Marriott Vacation Club set up and utilized International as the mandatory and only intermediary to enable its members to book a cruise using their membership points. The only way a member of Marriott Vacation Club can book a cruise using their membership points and to pay for any incidental sums claimed by International to be due for government fees and port fees (and later Cruise Line Pass Through Fees) is through International.

11.    Based upon information and belief, Plaintiffs allege that at all times alleged herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants.  In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants. More specifically, even after the discovery that Marriott Vacation Club members were being overcharged for the costs of the cruise through the guise of "port fees" and later "cruise line pass through fees," neither Defendant sought to refund to members the out-of-pocket sums charged to them for the cruises or changed their practices.

12.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000 and putative class members are citizens of a different state than Defendants.

13.     Venue is proper in this District because, as alleged in this Second Amended Complaint, Defendants conducted and transacted business in this District, and a substantial portion of the events and conduct giving rise to the violations complained of in this action occurred in this District.

## FACTUAL ALLEGATIONS

14.     Defendant, Marriott Vacation Club is the primary timeshare brand of Marriott Vacations Worldwide Corporation. The brand comprises more than 50 Marriott Vacation Club properties throughout the United States, Caribbean, Europe, and Asia, and more than 400,000 owners.  Marriott Vacation Club resorts consist of one, two, and three-bedroom villas.

15.     Marriott Ownership Resorts, Inc., was started in 1984 on Hilton Head Island, South Carolina, with the acquisition of American Resorts and its 122 villas on Hilton Head Island, which later became the Marriott Monarch at Sea Pines resort.  In 1985, Marriott Rewards started a partnership with Marriott Ownership Resorts. In 1995, Marriott Ownership Resorts, Inc. was renamed, becoming Marriott Vacation Club International (MVCI) reflecting the company's evolution from real estate development to vacations. In the mid-2000s, Marriott Vacation Club International began to market its core timeshare brand as Marriott Vacation Club.

16.     In November of 2011, Marriott Vacation Club was spun off from Marriott International and became a publicly traded company (NYSE: VAC) under the new parent company Marriott Vacations Worldwide, based in Orlando, Florida. Marriott Vacation Club is one of three brands that include The Ritz-Carlton Destination Club and Grand Residences by

Marriott. Marriott Vacation Club markets to the public a timeshare concept which, in exchange for a one time purchase provides the purchaser, now an owner, with an annual allotment of Vacation Club Points: flexible "vacation currency" that can be used each year towards the owner's choice of timeshare vacations.   On its website, Marriott Vacation Club describes its points system as follows:

**Use your Vacation Club Points to experience dream vacations.**

Marriott Vacation Club resort stays are assigned a Vacation Club Points value based on accommodation size, length of stay, location and season. Owners in the Marriott Vacation Club Destinations™ program can choose from any location and any size villa, check in on any day they wish and stay as long as they want — or use Vacation Club Points to experience other types of vacations such as cruises, tours, exchanges, hotel stays and travel services.

**You get a new allotment every year.**

One of the greatest aspects of points-based vacation ownership in the Marriott Vacation Club Destinations™ program is that your Vacation Club Points are replenished each year. That means, every year you will get to choose from an ever-growing collection of exciting timeshare vacations — currently more than 5,000 unique options and experiences. Return to a favorite destination every year or explore the world and never experience the same vacation twice. It's all up to you, and each year you get to choose.

**You can bank or borrow for even greater flexibility.**

Got an idea for a truly epic vacation? Plan on bringing a big group this year? No problem. As a timeshare Owner in the Marriott Vacation Club Destinations program, if your vacation plans call for more Vacation Club Points than your annual allotment, you can enjoy the flexibility to borrow from the following year's balance to be used toward this year's vacation. Or, will your schedule only allow for a short vacation this year? You won't lose any Vacation Club Points; you can bank the remainder for use next year, if you like.

**You can add Vacation Club Points at any time.**

As your life changes, your vacation ownership can evolve right along with you. Plus, as your vacation portfolio grows, you can achieve Premier or Premier Plus status with Marriott Vacation Club — and enjoy enhanced benefits such as access to VIP weekends, select The Ritz-Carlton Club locations, luxury cruises, Marriott Rewards® upgrades and more.

17.     Unfortunately, members are not told that when booking their cruises using points, that their points will not cover the costs of the cruise and that they will be required to pay for part of the fare with cash. The cash component of the fare will be hidden under the deceptive and misleading label as "port fees," and later when it was changed, as a "cruise line pass through fees."

18.     Marriott Vacation Club claims that it is the leader in Timeshare Ownership offering the ultimate in vacation flexibility with a deeded, points-based ownership program.

19.     Marriott Vacation Club claims that annual Vacation Club Points can be used to enjoy weeks of vacation in luxurious destinations, for weekend getaways and other vacation experiences. The types of vacations available for owners are as follows:

- Marriott Vacation Club Collection - More than 50 Marriott Vacation Club resorts

- Marriott Collection - More than 3,000 Marriott hotels and resorts

- Explorer Collection - Specialty travel options including safaris, wine tours and cruises

- World Traveler Collection - More than 2,500 affiliate resorts in 75 countries

20.     The purchase price for ownership is not cheap. On its website, Marriott Vacation Club provides a few examples of the costs of Vacation Club Points.  Here are a few examples of popular Vacation Club Points levels:

| Vacation Club Points | Financing Available* | | Annual Maintenance Fees |
|---|---|---|---|
| | 10% Down Payment | Approximate Monthly Payment | |
| 1,500 Points | $1,938 | $279 | $755 |

| 2,500 Points | $3,230 | $443 | $1,258 |
| 3,500 Points | $4,522 | $594 | $1,761 |

21.     Defendants engage in a common course of conduct and practice of hiding the true cost of a cruise by creating, inflating and collecting deceptively exaggerated port fees (later described as cruise line pass through fees) in booking cruises for members of Marriott Vacation Club. By deceptively and unfairly hiding the true cost of the fare from members, Marriot Vacation Club does not have to pay the additional sums required to cover the total fare costs.

22.     Sixteen years after the landmark decision in *Latman v Costa Cruise Lines*, 758 So. 2d 699 (Fla. 3d DCA 2000), a case that put the travel industry on notice that the conduct of collecting "port fees" as a part of the cruise fare was considered unfair and deceptive – the conduct here is strikingly similar to *Latman*, but with even more egregious facts – Defendants engaged in a common and uniform course of conduct and scheme that damaged Plaintiffs and Class Members that Plaintiffs seek to represent.

23.     Terms such as "fare" and "cruise fare" are clear; they mean the costs of the cruise. These terms have the same meaning in the travel industry. For example, on Carnival's website, these terms are defined as follows:

> DEFINITIONS AND SCOPE OF CONTRACT (b) "Cruise Fare" or "Fare" means the amount paid for the cruise which includes full board, ordinary ship's food during the voyage, but not gratuities, spirits, wine, beer, soft drinks or mineral waters, shore excursions, salon and spa services, Carnival LIVE concerts, or any other incidental charge or expense. The cruise fare shall be deemed to be earned when paid and not refundable except as stated in Carnival's brochure applicable to the voyage and as provided in Clauses 7 and 8, herein.

24.     Under Defendants' scheme, members were deceived into believing that their points were paying for the full cruise fare. Members were not told that they were paying money

out of their pockets, charged to and collected by International as "port fees" (later changed to "cruise line pass through fees") to cover a portion of the cost for the cruise fare.

25.     In the cruise industry, port charges or government fees are used to describe certain pass through expenses paid to governments and ports where the cruise ship docks during a cruise. As one travel site explains:

26.     In    normal    English,    that    legal-speak    refers    to    costs    such    as:

• Tolls;
• Ship inspections;
• Local harbor pilots;
• Air, hotel or VAT taxes incurred as part of a land excursion;
• Immigration and naturalization costs;
• Internal Revenue Service charges;
• Baggage handling at embarkation and disembarkation ports; and
• Security services.

All of these obligations are calculated on a per ton or per vessel basis, and the cruise lines spread the expense across a ship's total number of passengers. While no cruise line will breakdown exactly how much of the fee is going toward what specific charge, the total costs for government fees and port charges are typically less than 20 percent of the base cruise fare—though they can be as high as 50 percent.

Sherman's Travel (https://blog.shermanstravel.com/2014/cruise-taxes-explained/).

27.     Carnival's own website affords the following explanation of port charges:

(c) Cruise Fare does not include Cruise Taxes, Fees, and Port Expenses. "Cruise Taxes, Fees, and Port Expenses" may include any and all fees, charges, tolls and taxes imposed on Carnival, by governmental or quasigovernmental authorities, as well as third party fees and charges arising from a vessel's presence in a harbor or port. Cruise Taxes, Fees and Port Expenses may include U.S. Customs fees, head taxes, Panama Canal tolls, dockage fees, wharfage fees, inspection fees, pilotage, immigration and naturalization fees, and Internal Revenue Service fees, as well as fees associated with navigation, berthing, stevedoring, baggage handling/storage, and security services. Cruise Taxes, Fees, and Port Expenses may be assessed per passenger, per berth, per ton or per vessel. Assessments calculated on a per ton or per vessel basis will be spread over the number of passengers on the Vessel. Cruise Taxes, Fees and Port Expenses are subject to change and Carnival reserves the right to collect any increases in effect at the time of sailing even if the fare has already been paid in full.

*See* Carnival, *Legal Notice – Ticket Contract* (last accessed June 17, 2016),

https://www.carnival.com/about-carnival/legal-notice/ticket-contract.aspx

28.     Travel agents are duty-bound to provide true and accurate information when

dealing with consumers. In its Code of Ethics, the American Society of Travel Agents states:

> Travelers depend on travel agencies and others affiliated with ASTA to guide
> them honestly and competently. All ASTA members pledge to conduct their
> business activities in a manner that promotes the ideal of
> integrity in travel and agree to act in accordance with the applicable sections of
> the following Principles of the ASTA Code of Ethics. Complaints arising under
> this Code should be filed in writing with the ASTA Consumer Affairs
> Department.
>
> ASTA has the following categories of membership: Travel Agency Member (also
> known as Core Member), Travel Agency Employee Member, Independent
> Member, Non-Affiliated Member, Premium Agency Member, Premium Agency
> Employee Member, International Travel Agency Company Member, International
> Travel Associate Member, Allied Company Member, Allied Associate Member,
> Travel School Member, and Honorary Member.
>
> **Responsibilities of Travel Agency (also known as Core), Travel**
> **Agency Employee, Independent, Non-Affiliated, Premium Agency,**
> **Premium Agency Employee, International Travel Agency Company**
> **and International Travel Associate Members:**
>
> 1. **Accuracy.** ASTA members will be factual and accurate when providing
> information about their services and the services of any firm they represent. They
> will not use deceptive practices.

29.     During a deposition of a corporate representative of Carnival Cruise Line,

Carnival Cruise Line's representative testified that it considers that use of the term "port fees" or

"pass through fee" to describe to a consumer a portion of the fare to be misleading.

30.     The positon of Carnival Cruise Line on the deceptive use of the term "port fees"

as deceptive is well grounded.  For example, in addition to the decision in *Latman*, in 1997, six

major cruise lines operating in Florida (including Carnival Cruise Lines), entered into

agreements with the Florida Attorney General to cease using the term "port charges" to increase

their cruise income, which charges were unrelated to actual dockage charges. Since that time, the Florida Attorney General has been steadfast in the positon that the cruise fare must be accurately disclosed to consumers and that no portion of the fare should be disclosed as a "port charge or port expense charge."

31.     The deception and sophistry described above has been very lucrative for both Defendants. Among other income generated from their scheme, Defendants have deceived their members into believing that the Marriott Vacation points they were using to book cruises covered the full fare, thus saving money that Marriott Vacation Club would have otherwise had to pay were it required to pay the full-fare costs. International has been able to generate income from service fees of $19.95 per cruise, and earn other profits from the sums it has collected for booking cruises.

## INDIVIDUAL PLAINTIFFS' ALLEGATIONS

### A.     Daniel Finerman

32.     Plaintiff, Daniel Finerman, became a member of Marriott Vacation Club in 2005 when he purchased a one-week timeshare in Aruba. As a member of Marriott Vacation Club, Plaintiff also became a member of the Vacation Club Destination Exchange Program, which allows its members to obtain points in exchange for not using their time-share allotment at the timeshare. Mr. Finerman's week at his timeshare is worth 3,075 points, which he can use for other vacation destinations, adventure travel, cruises, guided tours and special hotel experience packages.

33.     With his points, Mr. Finerman booked and paid through Marriott Vacation Club for a six-day Western Caribbean cruise departing from Ft. Lauderdale on November 9, 2014. The

cruise was on a vessel operated as part of the Carnival Cruise Line.  The cost of the cruise for him and his spouse was 2,650 points.

34.     In order to book the cruise using his Marriott Vacation Club points, Mr. Finerman was connected to a representative of International who handled the booking process.

35.     In addition to his points, Mr. Finerman was billed by Marriott Vacation Club the sum of $566.17, which consisted of the following: $159.00 per person for "Port Fees," $114.11 per person for Government Fees, and a processing fee of $19.95, for which he paid.

36.     On  June  5,  2014,  Kalynn  Kruger,  using  the  email  address "ourvacationcenter.com" sent an email to Mr. Finerman confirming that he and his wife were booked on the cruise on Carnival Cruise Line.  The email, which is set forth below, used the Marriott Vacation Club trademark or trade name.

From: kalynn.krueger@ourvacationcenter.com
To: dfschmagel@aol.com
Sent: 6/5/2014 9:17:17 P.M. Eastern Daylight Time
Subj: Cruise Receipt and Itinerary for Cruise ID #: CRBK1824183

**Marriott**
VACATION CLUB

**Our Vacation Center**     1-866-503-289
15501 N Dial Blvd
Scottsdale, Arizona
85260

| Booking Detail | | Passengers |
|---|---|---|

Passengers
Mr. Daniel Finerman
Mrs. Rosanne Finerman

| | | |
|---|---|---|
| Cruise line: | Carnival Cruise Lines - Carnival Freedom | |
| Destination: | Caribbean, Western | |
| Sailing date: | 11/9/2014 - 11/15/2014 | **Days** 6 |
| Cabin: | 8N - 8459 | **Dining pref:** Open Seating |

| | |
|---|---|
| Ref Number: | CRBK1824183 |
| Booking Number: | 1V6HD1 |
| Booking Date: | 6/4/20 14 |
| Vacation Consultant: | Kalynn Krueger |
| Air Included: | No |
| GDS ID: | 1V6HD1 (Sabre) |

Mr. Daniel Finerman
55 Westminster DR
Palm Coast FL 32614

| Quantity | Description | Rate | Total |
|---|---|---|---|
| 2 | Govt Fees - Passenger 1, 2 | $114.11 | $228.22 |

1

14



| | | | | |
|---|---|---|---|---|
| 2 | Port Fees - Passenger 1, 2 | | $159.00 | $318.00 |
| 1 | Travel Insurance (applies to all passengers) | | $152.00 | $152.00 |
| | Subtotal | | | |
| | Processing Fee | | | |
| | **Total** | | | |
| | Payment Received | | | |
| | **Balance Due** | | | |

$698.22

$19.95

$718.17

$718.17 ✓

$0.00

**Payment Details**

| Date | Paid To | Last Four - Exp | Amount | Status |
|---|---|---|---|---|
| 6/4/2014 | Cruise Line | 426684******0585 - 04/2017 | $66.17 | Processed |
| 6/4/2014 | Cruise Line | 426684******0585 - 04/2017 | $ 500.00&n bsp; | Processed |
| 6/5/2014 | Insurance Company | 426684******0585 - 04/2017 | $152.00 | Processed |

If the cardholder is not listed above as a passenger, OVC requires the cardholder's signed authorization in order to charge payments and releasecruisedocuments. If using a debit card, please verify the amount does not exceed your daily limit.

**Travel Insurance**

| Policy #: | 14156W0053 | Coverage: | $566.17 |
|---|---|---|---|
| Insurance Type: | CSA | - | $152.00 |

**Itinerary Details**

| Day | Port | Arrival | Departure |
|---|---|---|---|
| 1 | Fort Lauderdale | | 4:00 PM |
| 2 | At Sea | | |
| 3 | Falmouth Jamaica | 9:00 AM | 5:00 PM |
| 4 | Grand Cayman | 8:00 AM | 4:00 PM |
| 5 | Cozumel | 10:00 AM | 6:00 PM |

2

37.     Concerned about these costs, Mr. Finerman called Marriott Vacation Club and was told by a company representative that these fees were not covered by points. Mr. Finerman had additional points which he could have used, if permitted to do so, to pay for the deceptive and misleadingly labeled "port fees" which would be lost if he did not use them by the end of the year, and these points were in fact lost and expired.

38.     Mr. Finerman booked the cruise using his points and paid the cash sum of $566.17, which he was required to pay to book the cruise.  After booking the cruise using his Marriott Vacation Club points and paying the port fees of $159.00 per person and government fees of $114.11 per person, Mr. Finerman went on a website maintained by Carnival.  For the same cruise that he had already booked, he discovered that the port fees and government fees totaled $235.08 for two persons.

39.     The amounts charged to and paid by Mr. Finerman for port fees were fabricated to cover the true cruise fare costs, and these deceptively billed and collected sums were never intended to and were not in fact paid to any governmental entity or port authority.

**B.     Donna Devino**

40.     Donna Devino is also a member of Marriott Vacation Club, and also received points as a benefit of her membership.

41.     Since becoming a member, she has booked several cruises using her Marriott Vacation Club points.  Each time, Mrs. Devino would call Marriott Vacation Club which would then connect her to an International representative, in the manner described above, who handled the actual booking.

42.     Specifically, Mrs. Devino took cruises through Marriott Vacation Club (and thus International) in June 2012, December 2013, and December 2014, amongst others.

43.     For example, with her points, Mrs. Devino booked and paid through Marriott Vacation Club for a four-day cruise departing from Ft. Lauderdale on December 4, 2014. The cruise was on a vessel operated as part of the Princess Cruise Line.

44.     For the Princess cruise, Mrs. Devino was charged $180.00 per person ($360.00 total) for government fees and cruise line pass through fees by Defendants.



**Marriott VACATION CLUB**

Our
Center
15501 N
Dial Blvd
Scottsdale,
Arizona
85260

1-



**Booking Detail**

| | |
|---|---|
| Cruise line: | Princess Cruises – Caribbean Princess |
| Destination: | Caribbean, Western |
| Sailing date: | 12/4/2014 – 12/8/2014   Days   4 |
| Cabin: | MB – D505   Dining pref: First (table: Medium – 6) |

**Passengers**
Mrs. Donna Devino
Mr. Thomas Devino

| | |
|---|---|
| Ref Number: | CRBK1830004 |
| Booking Number: | 8N5MVK |
| Booking Date: | 6/17/2014 |
| Vacation Consultant: | Catherine Livernois |
| Air Included: | No |
| GDS ID: | 8N5MVK |

Mrs. Donna Devino
16 Addison Rd
Howell NJ 07731

| Quantity | Description | Rate | Total |
|---|---|---|---|
| 2 | Govt Fees – Passenger 1, 2 | $80.00 | $160.00 |
| 2 | Cruise Line Pass Through Fees – Passenger 1, 2 | $100.00 | $200.00 |
| | | Subtotal | $360.00 |
| Total | | Processing Fee | $19.95 |
| | | | $379.95 |
| | | Payment Received | $379.95 |
| | | Balance Due | $0.00 |

**Payment Details**

| Date | Paid To | Last Four - Exp | Amount | Status |
|---|---|---|---|---|
| 6/18/2014 | Cruise Line | ████ 4338 – 09/2014 | $160.00 | Processed |
| 9/25/2014 | Cruise Line | ████ 4338 – 09 /2017 | $219.95 | Processed |

If the cardholder is not listed above as a passenger, CVC requires the
cardholder's signed authorization in order to charge payments and
release secure documents. If using a debit card, please verify the amount
does not exceed your daily limit.

**Travel Insurance**

Travel insurance was declined

**Itinerary Details**

| Day | Port | Arrival | Departure |
|---|---|---|---|
| 1 | Fort Lauderdale | | 4:00 PM |
| 2 | At Sea | | |
| 3 | Grand Cayman | 7:00 AM | 5:00 PM |
| 4 | At Sea | | |
| 5 | Fort Lauderdale | 7:00 AM | |

45.     However, when Mrs. Devino printed out the boarding passes from Princess Cruise Line's website, the passes stated that government fees and port fees amounted to $160.00 total, for two passengers.  She then called Princess Cruise Lines and confirmed that port fees and government fees for the cruise were $80.00 per person or $160.00 for two.

46.     Mrs. Devino then contacted Marriott Vacation Club directly about the issue, but it refused to reimburse Mrs. Devino for the difference in price.

47.     After discovering this overcharging related to the December 2014 Princess cruise, Mrs. Devino endeavored to discern whether similar overcharging had occurred on prior cruises.

48.     For example, Mrs. Devino booked and paid through Marriott Vacation Club for a seven-day cruise departing from Miami on December 7, 2013. The cruise was on a vessel operated as part of the Celebrity Cruise Line.  For the Celebrity cruise, Mrs. Devino was charged $272.13 per person ($544.26 total) for government fees and port fees by Defendants.

49.     However, when Mrs. Devino visited the Celebrity Cruise Line website and booked the same cruise with a sail date of December 12, 2015, government fees and port fees amounted to $100.91 per person ($201.82 total).

50.     Similarly, Mrs. Devino booked and paid through Marriott Vacation Club for a seven-day cruise departing from Seattle on June 3, 2012. The cruise was on a vessel operated as part of the Norwegian Cruise Line.  For the Norwegian cruise, Mrs. Devino was charged $418.40 per person ($836.80 total) for government fees and port fees by Defendants.

51.     When booking the same cruise on the Norweigan Cruise website with a sale date of June 7, 2015, government fees and port fees amounted to $208.73 per person ($417.46 total).

52.     Government fees and port fees paid by Mrs. Devino for the Celebrity cruise and the Norwegian cruise, like those for the Princess cruise, were fabricated, or at the very least,

inflated to increase profits, and these deceptively billed and collected sums were never intended to and were not in fact paid to any governmental entity or port authority in their entirety, rather, at least some portion of these sums were used to cover a portion of the cruise fare.

### CLASS ACTION ALLEGATIONS

53.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated as permitted by Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and (c)(4). Plaintiffs are informed and believe that there are at least thousands in the proposed Class. The proposed **Nationwide Class** consists of:

> **All persons throughout the United States who from 2010 to date were members of the Marriott Vacation Club and who booked a cruise through Defendants and who paid port fees or cruise line pass through fees.**

54.    The proposed **Florida** class consists of :

> **All Florida residents who from 2010 who were members of the Marriott Vacation Club and who booked a cruise through Defendants and whose telephone calls were recorded without their consent.**

55.    The proposed **New Jersey Subclass** consists of:

> **All New Jersey residents who from 2010 to date were members of the Marriott Vacation Club and who booked a cruise through Defendants and who paid port fees or cruise line pass through fees.**

Collectively, the Nationwide Class, and the Florida and New Jersey Subclasses are referred to as the **Classes**.

56.    Defendants are excluded from the Classes as well as any entity in which Defendants have a controlling interest, along with Defendants' legal representatives, officers, directors, assignees and successors.  Also excluded from the Classes is any judge to whom this action is assigned, together with any relative of such judge, and the spouse of any such persons, and the members of the judge's staff.

57.    The Classes are so numerous that joinder of all Members is impracticable. Information in the records of Defendants will establish the names and addresses of Class Members and the size of the Classes.

58.    The common questions of law and fact among all Class Members and New Jersey and Florida Subclass Members predominate over any issues affecting individual Class Members, and include the following:

a.    Whether Defendants billed and collected port fees or cruise line pass through fees in an amount not due or owing to any government or port authority;

b.    Whether Defendants' conduct in billing and collecting port fees or cruise line pass through fees in an amount not due or owing to any government or port authority is unfair, deceptive, and/or unconscionable;

c.    Whether Defendants' conduct in failing to disclose to Class Members that their points did not cover the total cruise fare and that they were being charged money under the guise of "port fees" or "cruise line pass through fees" is unfair, deceptive and/or unconscionable;

d.    Whether Marriott Vacation Club had a contractual obligation with Class Members which provided that Class Members' points would cover the total cost of the cruise fare, whether those contractual obligations were breached when Marriott Vacation Club failed to provide cruises in exchange for Class Members' points, and to charge

them additional sums to cover the costs of cruises under the guise of port fees or cruise line pass through fees;

e. Whether Defendants have unjustly retained a benefit at the expense of Plaintiffs and the Class by not providing cruises in exchange for points and requiring that Plaintiffs and Class Members pay additional sums under the guise of port fees and cruise line pass through fees;

f. Whether Plaintiffs and Class Members are entitled to equitable and injunctive relief; and

g. Whether Plaintiffs and Class Members have sustained monetary loss and the proper measure of that loss.

59.     The common questions of law and fact among all  Florida Subclass Members predominate over any issues affecting individual Subclass Members and include the following:

a. Whether Defendants obtained the consent of Florida Subclass Members to record their respective telephone conversations before recording their conversations;

b. Whether Plaintiff Finerman and Florida Subclass Members are entitled to statutory damages and to punitive damages; and

c. Whether Plaintiff Finerman and Florida Subclass Members are entitled to equitable and injunctive relief.

60.     Plaintiffs will fairly and adequately protect the interests of all the Classes.

61.     Plaintiffs' claims are typical of those of other Class Members, as there are no material differences in the facts and law underlying their claims and Plaintiffs' prosecution of their claims will advance the claims of all Class Members.

62.     Plaintiffs have retained competent counsel experienced in the prosecution of this type of Class litigation.

63.     Class treatment of the claims set forth in this Second Amended Complaint is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation, particularly in light of the damages involved when compared with just the filing fees alone, would make it impracticable or impossible for the proposed Class Members to prosecute their claims individually. Absent a Class action, a multiplicity of individual lawsuits would be required to address the claims between the Class Members and Defendants so that inconsistent treatment and adjudication of the claims would likely result.

64.     The litigation and trial of Plaintiffs' claims are manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, the presence of a reasonable mathematical based methodology for generalized proof of damages and the impact of Defendants' conduct on the Class, and the readily ascertainable identities of many Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a Class action.

65.     Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

66.     Defendants have acted or refused to act on grounds that apply generally to the Class, making final injunctive relief appropriate to the Class as a whole.

67.     Defendants' acts and omissions are the direct and proximate and/or direct cause of damage described more fully in the paragraphs set forth in this Amended Complaint.

## COUNT I – VIOLATION OF FDUTPA AS TO BOTH DEFENDANTS AS TO THE NATIONWIDE CLASS

68.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 to 67 as if full set forth herein.

69.     Plaintiffs assert this cause of action on behalf of themselves and the Nationwide Class.

70.     Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201, *et seq*., declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.* § 501.201.

71.     Plaintiffs and Nationwide Class members are "consumers" as defined by Florida Statute § 501.203(7), and the subject transactions are "trade or commerce" as defined by Florida Statute § 501.203(8).

72.     Defendants violated and continue to violate FDUPTA by engaging in the described unconscionable, deceptive, unfair acts or practices proscribed by Florida Statute § 501.201, *et seq*.  Defendants' practices were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

73.      Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of its trade and commerce by, inter alia, their deceptive creation, inflation and collection of government fees and/or port fees that were not owed to either governmental entities or port authorities, but rather were, in fact, portions of the cruise fare.

74.     Defendants' conduct which was designed, engineered, emanated and was controlled from the state of Florida, is clearly unfair, deceptive, and unconscionable as the practice of falsely creating or inflating a port fee above and beyond that which is owed to a government or port authority in order to cover part of the costs of cruise fares; this practice has long been regarded as a deceptive practice.

## COUNT II – UNJUST ENRICHMENT AS TO BOTH DEFENDANTS AS TO THE NATIONWIDE CLASS

75.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 to 67 as if fully set forth herein.

76.     Plaintiffs assert this cause of action on behalf of themselves and the Nationwide Class.

77.     Plaintiffs and the Nationwide Class have conferred a benefit upon Defendants by paying them sums for port fees or cruise line pass through fees which were not owed to either governmental entities or port authorities and were the hidden costs of part of the cruise line fare, and which sums otherwise should have been paid  by Defendants.

78.     By their unlawful conduct, Defendants have unjustly received and retained a benefit at the expense of Plaintiffs and Class Members.

79.     Under principles of equity and good conscience, Defendants should not be permitted to retain money belonging to Plaintiffs and the Class that Defendants unjustly were not required to pay for cruise fares, as alleged herein without providing compensation to Plaintiffs and Class Members.

80.     Plaintiffs and the Class have suffered financial loss as a direct result of Defendants' conduct.

81.     Plaintiffs and Nationwide Class Members are entitled to restitution of, disgorgement of, or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants, and for such other relief that this Court deems proper, as a result of their conduct alleged herein.

## COUNT III-BREACH OF CONTRACT AS TO MARRIOTT VACATION CLUB AS TO THE NATIONWIDE CLASS

82.     Plaintiffs re-allege and incorporate by reference Paragraphs 1 to 67 as if fully set forth herein.

83.     At all times herein material, Plaintiffs and Class Members were members of Marriott Vacation Club's timeshare program whereby members were allocated on a yearly basis, as described above, a number of points for their use in booking resort vacations at various resorts within the Marriott Vacation Club system, including booking cruises on cruise lines.

84.     Pursuant to Marriott Vacation Club's contract with Plaintiffs and Class Members, Marriott Vacation Club agreed that members could use their points without any additional sums out of their respective pockets to pay for the cruise fare to book cruises so long as Plaintiffs and Class Members had a sufficient number of points for the particular cruise which they wanted to take.

85.     Marriott Vacation Club breached its contractual obligations with Plaintiffs and Class Members in that Plaintiffs and Class Members did not receive a cruise in exchange for only their points in that they were charged and paid money from their pocket under the guise of fictional "port fees" or "cruise line pass through fees" to pay for a portion of the cruise fare.

86.     Plaintiffs and Class Members were damaged as a direct consequence of Marriott Vacation Club's breach in that Plaintiffs and Class Members were charged and paid money from

their pocket under the guise of fictional "port fees " or "cruise line pass through fees" to pay for a portion of the cruise fare for the cruises which Plaintiffs and Class Members booked and took.

87.     All conditions precedent to the admittance of this claim have occurred, been satisfied or been excused by Defendant's conduct as alleged herein.

## COUNT IV – VIOLATION OF NJCFA AS TO BOTH DEFENDANTS AS TO THE NEW JERSEY CLASS

88.     Plaintiff Devino re-alleges and incorporates by reference Paragraphs 1 to 67 as if fully set forth herein.

89.     Mrs. Devino asserts this cause of action on behalf of herself and the New Jersey Subclass.

90.     The New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq.* ("NJCFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

91.     Mrs. Devino, the New Jersey Subclass Members, and Defendants are persons under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

92.     Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. §56:8-1(c), (e). Defendants' actions as set forth herein occurred in the conduct of trade or commerce.

93.     The NJCFA prohibits, in relevant part, "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise. . . ." N.J. Stat. § 56:8-2.

94.     As described above, Defendants deceptively created, or inflated, and collected port fees or cruise line pass through fees that were not owed to either governmental entities or port authorities.

95.     Mrs. Devino and the New Jersey Subclass Members reasonably expected that the charged port fees or cruise line pass through fees were not deceptively created or inflated to cover part of the cruise fare, and that their points were covering the cruise fare.

96.     Defendants knew, or, in the exercise of diligence, should have known, the port fees or cruise line pass through fees they charged for and collected were deceptively created or inflated.

97.     In failing to disclose the deceptively created or inflated port fees or cruise line pass through fees were part of the cruise fare and that their points were not covering the full cruise fare, Defendants omitted material facts they were under a duty to disclose to Mrs. Devino and the New Jersey Subclass Members.

98.     The injury to consumers by this conduct greatly outweighs any alleged countervailing benefit to consumers or competition under all of the circumstances.

99.     Had Mrs. Devino and the New Jersey Subclass Members known about the deceptively created or inflated port charges, they would not have paid them.

100.    As a direct and proximate result of Defendants' actions, Mrs. Devino and the New Jersey Subclass Members have suffered ascertainable loss and other damages.

101.    Defendants had an ongoing duty to all Marriott Vacation Club Members to refrain from unfair and deceptive practices under the NJCFA in the course of their business.

102.     Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

103.     As a result of the foregoing wrongful conduct of Defendants, Mrs. Devino and the New Jersey Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, treble damages, an order enjoining Defendants' deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

## COUNT V - VIOLATION OF FLORIDA TELEPHONE RECORDING LAW AS TO BOTH DEFENDANTS AS TO THE FLORIDA SUBCLASS

104.     Plaintiff Finerman incorporates by reference paragraphs 1 through 67 above, as though fully set forth herein.

105.     Defendant's willful, knowing, and intentional recording of Plaintiff's and the Florida Subclass Members' telephone calls without their consent or knowledge constitutes a violation of Florida law, specifically Fla. Stat. § 934.01 *et seq*.

106.     Plaintiff and Class Members are entitled to recover statutory damages as provided by law, punitive damages, interest, attorneys' fees, costs and expenses, and all other and appropriate relief.

## RELIEF SOUGHT

**FOR ALL THESE REASONS**, Plaintiffs individually and on behalf of all others similarly situated, seek relief as more fully set forth in this Complaint as follows:

a.   For an order certifying that the action may be maintained as a Class action, under Rule 23(a), (b)(1), (b)(2),(b)(3) and (c)(4) of the Federal Rules of Civil

Procedure, appointing Plaintiffs, Daniel Finerman and Donna Devino, as Class Representatives, and appointing their counsel as Counsel for the Class;

b.  For an award of damages, plus interest on the sums paid by them as described above from the date such sums were paid;

c.  For an award of equitable relief as follows:

    i.  Enjoining Defendants from engaging in similar unfair, unlawful, and deceptive misconduct in the future;

    ii.  Requiring Defendants to disgorge all ill-gotten gains flowing from the wrongful conduct described in this Complaint;

d.  For an award of attorney's fees, costs and litigation expenses;

e.  For an award of damages, and punitive damages, as permitted under Section 934.10 of the Florida Statutes; and

f.  For any further legal and equitable relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on issues so triable.

Respectfully submitted,

/s/ John A. Yanchunis
**JOHN A. YANCHUNIS**
FBN: 0324681
jyanchunis@forthepeople.com
**MARCIO W. VALLADARES**
FBN:  0986917
mvalladares@forthepeople.com
**PATRICK A. BARTHLE II**
FBN:  0099286
pbarthle@forthepeople.com
**MORGAN & MORGAN**

29

**COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, Florida  33602
(813) 223-5505 Telephone
(813) 223-5402 Facsimile

**STEVEN TEPPLER**
FBN: 14787
**ABBOTT LAW GROUP, P.A.**
2929 Plummer Cove Road
Jacksonville, FL  32223
Telephone: 904.292.1111
Facsimile: 904.292.1220
steppler@abbottlawpa.com

**JOEL R. RHINE**
*Admitted Pro Hac Vice*
NC State Bar No. 16028
**RHINE LAW FIRM, PC**
1612 Military Cutoff Rd, Suite 300
Wilmington, NC 28403
Telephone: (910)  772-9960
Facsimile: (910) 772-9062
JRR@rhinelawfirm.com

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on January 19, 2017, I electronically filed a true and correct

copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send

notification to all attorneys of record in this matter.


/s/ John A. Yanchunis